UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL BERMAN,

        Plaintiff,

  -against-

NEO@OGILVY LLC and WPP GROUP USA, INC.

        Defendants.

Index No. 14 CV 523 (GHW) (SN)

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION
TO DISMISS THE COMPLAINT IN ITS ENTIRETY**

DAVIS & GILBERT LLP
Howard J. Rubin
Jennifer Tafet Klausner
1740 Broadway
New York, New York 10019
(212) 468-4800
*Attorneys for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 6

    A.    PLAINTIFF'S EMPLOYMENT WITH NEO ....................................................... 6

    B.    DEFENDANTS' POLICIES ............................................................................... 10

ARGUMENT .................................................................................................................... 11

I.    THE LEGAL STANDARD .......................................................................................... 11

II.    ADMISSIONS IN THE COMPLAINT AND THE DOCUMENTS REFERENCED
THEREIN DEMONSTRATE THAT THIS COURT SHOULD DISMISS PLAINTIFF'S
DODD FRANK ANTI-RETALIATION CLAIM ......................................................... 12

    A.    PLAINTIFF WAS NOT A WHISTLEBLOWER UNDER DODD FRANK AT THE TIME
OF ANY ALLEGED ADVERSE ACTIONS, AS HE HAD NOT REPORTED ANY
VIOLATIONS TO THE SEC ............................................................................... 13

    B.    PLAINTIFF DID NOT HAVE A REASONABLE BELIEF THAT ANY OF THE
ALLEGED VIOLATIONS CONSTITUTED SECURITIES LAW VIOLATIONS ................... 17

        (i)    Plaintiff Has the Burden to Establish His Reasonable Belief or He
Cannot State a Prima Facie Case of Retaliation ....................................... 17

        (ii)    Plaintiff's Conclusory Allegations are Insufficient to Establish His
Reasonable Belief That Defendants' Actions Violated Securities
Laws ........................................................................................................ 21

        (iii)    Plaintiff's Belief That the Allegations Violated Securities Laws is
Particularly Unreasonable Given His Education and Training ................. 23

        (iv)    Plaintiff's Bad Faith Wholly Undermines Any Allegation That He
had a Reasonable Belief that Securities Laws Might Have Been
Violated ................................................................................................... 25

III.    COUNTS TWO AND THREE FAIL TO STATE CLAIMS FOR BREACH OF AN
EXPRESS OR IMPLIED CONTRACT ........................................................................ 26

CONCLUSION ................................................................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmad v. Morgan Stanley & Co., Inc.*,
   13 Ci.v 6394, 2014 U.S. Dist. LEXIS 23543 (S.D.N.Y. Feb. 21, 2014) ................................14

*Asadi v. G.E. Energy (USA), L.L.C.*,
   720 F.3d 620 (5th Cir. 2013) ...................................................................................... 2, 14-17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................................... 11-12

*Banko v. Apple Inc.*,
   No. CV 13-02977 RS, 2013 U.S. Dist. LEXIS 149686
   (N.D. Cal. Sept. 27, 2013) ......................................................................................................16

*Baron v. Port Auth. of N.Y. & N.J.*,
   271 F.3d 81 (2d Cir. 2001)..........................................................................................27-28, 29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................................11

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)...................................................................................................12

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................................................................................14

*In re: Commodity Exch. Inc., Silver Futures & Options Trading Litig.*,
   11 Md. 2213 (RPP), 2012 U.S. Dist. LEXIS 181487
   (S.D.N.Y. Dec. 21, 2012).......................................................................................................22

*Day v. Staples, Inc.*,
   555 F.3d 42 (1st Cir. 2009)....................................................................................................22

*De Los Santos v. City of New York*,
   482 F. Supp. 2d 346 (S.D.N.Y. 2007)...................................................................................23

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010)...................................................................................................12

*Egan v. TradingScreen, Inc.*,
   10 Civ. 8202 (LBS), 2011 U.S. Dist. LEXIS 103416
   (S.D.N.Y. Sept. 12, 2011)...............................................................................................22-23

*Galdieri-Ambrosini v. National Realty & Dev. Corp.*,
  136 F.3d 276 (2d Cir. 1998)..............................................................................23

*Glaxosmithkline LLC v. Beede*,
  1:13-cv-00001 (MAD/RFT), 2014 U.S. Dist. LEXIS 28663
  (N.D.N.Y. Mar. 6, 2014)...................................................................................12

*Horn v. New York Times*,
  100 N.Y.2d 85 (2003) ......................................................................................26

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs., P.C.*,
  716 F.3d 10 (2d Cir. 2013)...............................................................................23

*Liu v. Siemens A.G.*,
  13 Civ. 317 (WHP), 2013 U.S. Dist. LEXIS 151005
  (S.D.N.Y. Oct. 21, 2013) ..................................................................................14

*Lobosco v. N.Y. Tel. Co./NYNEX*,
  96 N.Y.2d 312 (2001) ...................................................................................26-29

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006)..............................................................................12

*Martin v. N.Y. Life Ins. Co.*,
  148 N.Y. 117 (1895) ........................................................................................26

*Miller v. Huntington Hosp.*,
  15 A.D.3d 548 (2d Dep't 2005).........................................................................27

*Murphy v. Am. Home Prods. Corp.*,
  58 N.Y.2d 293 (1983) ......................................................................................26

*Roganti v. Metro. Life Ins. Co.*,
  12 Civ. 0161 (PAE), 2012 U.S. Dist. LEXIS 84939
  (S.D.N.Y. June 19, 2012)..................................................................................22

*Rooney v. Tyson*,
  91 N.Y.2d 685 (1998) ......................................................................................26

*Rosenblum v. Thomson Reuters (Markets) LLC*,
  13 Civ. 2219 (SAS), 2013 U.S. Dist. LEXIS 153635
  (S.D.N.Y. Oct. 25, 2013) ..................................................................................14

*Sabetay v. Sterling Drug, Inc.*,
  69 N.Y.2d 329 (1987) .......................................................................................27

*Sharkey v. J.P. Morgan Chase & Co.*,
    10 Civ. 3824, 2010 U.S. Dist. LEXIS 139761
    (S.D.N.Y. Jan. 14, 2011)...................................................................................27, 28, 29

*Wagner v. Bank of Am. Corp.*,
    Civil Action No. 12-cv-00381-RBJ, 2013 U.S. Dist. LEXIS 101297
    (D. Colo. July 19, 2013)..........................................................................................16

*Williams-Wilson v. NDC Health Corp.*,
    no. 2005-SOX-00097, 2007 DOLSOX LEXIS 4
    (US Dep't of Labor Jan. 31, 2007) ...................................................................... 24-25

**Statutes and Rules**

17 C.F.R. § 240.21F-2(b)(1) ..............................................................................14, 15

17 C.F.R. § 240.21F-9 ............................................................................................15

15 U.S.C. § 78u-6(a)(6) (2014)...............................................................................13

15 U.S.C. § 78u-6(h)(1)(A) (2014) ..................................................................... 13-14

18 U.S.C. § 1514A ..................................................................................................16

Federal Rule of Civil Procedure 12(b)(6) ..................................................................1

Defendants Neo@Ogilvy LLC ("Neo") and WPP Group USA, Inc. (collectively "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint (the "Complaint") filed by Plaintiff Daniel Berman ("Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Obviously regretting his decision to raise his hand and let his employer know that he was willing to voluntarily leave his role as Financial Director when the finance department was undergoing a reorganization, Plaintiff has now twisted the facts and is stretching the law in an attempt to characterize himself as a whistleblower discharged in retaliation for activity protected under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank" or the "Act"). A review of the four issues that form the basis of his Dodd Frank anti-retaliation claim, however, and the timing and manner of Plaintiff's disclosures of these issues, make it clear that Plaintiff is not a true whistleblower looking out for the shareholders of a public company, but instead is on a deliberate campaign to cash out as a result of an unfortunate decision he made.

Not long after Plaintiff indicated he wanted to leave his position, Neo put his name on a list of those to be terminated in a reduction of force necessitated by the department's reorganization.[1] Finally facing the consequence of his original decision, he looked back and found four accounting transactions that arose in the ordinary course of his performance as Financial Director and tried to characterize them as required and/or protected disclosures under Dodd Frank in an effort to leverage a settlement payment from his employer Neo. It is clear, however, that Plaintiff never had a reasonable belief that these transactions even possibly

---

[1] Plaintiff alleges that he refused to continue working for Neo and that Defendants have characterized that as a "voluntary" termination. (Complaint ¶¶ 67 and 68.) (A copy of the Complaint is attached as Exhibit A to the Affidavit of Gregg Brochin ("Brochin Aff.").) However, Plaintiff has admitted that WPP Group USA, Inc. was looking for another job for him because he had indicated his desire to leave, as he also claims that its refusal to hire him into another WPP business unit was one element of the retaliation he allegedly suffered. (*Id.* ¶ 80.)

violated securities laws – not when he was employed and not after.  If he did, he would have made real efforts to blow the whistle on these accounting transactions instead of spending nine months threatening Neo and asking it to pay him in exchange for his agreement to refrain from blowing any whistle at all.  He would have: (1) timely called the Ethics Hotline listed in the handbook that he relies on in his Complaint for his breach of contract claims; and/or (2) filed a complaint with the Department of Labor under the Sarbanes-Oxley Act of 2002 ("SOX"); and/or (3) reported these issues to the Securities and Exchange Commission (the "SEC" or the "Commission") when he discovered them.  Instead, only after he was terminated did he have his lawyer write a letter threatening that he would go to the WPP Audit Committee and file a lawsuit if he did not receive the monetary payment he wanted. After that threat was not successful, he had his lawyer draft and send to Neo's counsel a complaint that had a deliberate blank in it for the date on which he would make his disclosure of these issues to the SEC if he was not paid the money he wanted.  And then, when that did not result in any big offer of payment to him, he threatened to go to one of Neo's biggest clients and tell that client about accounting practices that he believed harmed it. That threat was made in the form of yet another draft complaint, this time with a blank for the date he was planning to go talk to that client.  It was only after all those efforts failed that Plaintiff filed this Complaint.  It is not surprising, however, that Plaintiff went to great lengths to avoid bringing this case, because, as shown in detail below, his Dodd Frank anti-retaliation claim and his breach of contract claims are devoid of merit for a number of reasons.

First, as a threshold issue, if this Court follows the only Court of Appeals to have decided this issue, *Asadi v. G.E. Energy (USA), L.L.C.,* 720 F.3d 620 (5th Cir. 2013), it will dismiss Plaintiff's Dodd Frank claim for the simple reason that Plaintiff is not a whistleblower under that

Act. According to the unambiguous terms of that statute, for an individual to be a whistleblower, he or she must provide information relating to a violation of a securities law *to the SEC*. Since it is undisputed that all of the allegedly retaliatory conduct at issue here took place long before Plaintiff went to the SEC, he does not satisfy the definition of whistleblower and is not entitled to protection under the Act. As the Fifth Circuit has held, it was Congress' clear intent to require individuals to report information to the SEC to qualify as a whistleblower under Dodd Frank. Moreover, as that Court reasoned, if an individual can qualify as a whistleblower under Dodd Frank if he only makes internal disclosures prior to any adverse action, then the anti-retaliation provision in SOX would be rendered moot. Plaintiff missed the deadline for filing a SOX claim. He should not be allowed to benefit from this failure by going to the SEC long after the allegedly retaliatory conduct and only after attempts to obtain a monetary payment were rebuffed. Thus, as a matter of law, this Court should dismiss Plaintiff's Dodd Frank anti-retaliation claim.

But, even if Plaintiff's failure to make disclosures to the SEC before the alleged adverse actions at issue here is not fatal to his claim, Defendants' motion to dismiss should still be granted because it is clear from the face of the Complaint, and from Plaintiff's admissions in it, that he did not reasonably believe that the four transactions at issue were "possible securities law violations," as is required to state a claim for retaliation under Dodd Frank.

The first transaction relates to allegedly delayed media payments. Plaintiff claims that Neo was slow in making payments owed to media outlets for media that ran on behalf of one its clients and that this practice was "intentionally fraudulent" and "intentionally harmed [Neo's client]."[2] Neo, like any agency that purchases media on behalf of a client, collects the money from its client and then pays the media outlets when those outlets confirm delivery of the media

---

[2] It is important to note that Plaintiff does not claim that anyone other than Neo's advertiser client was harmed by this alleged conduct (although it's hard to see how even that client was hurt if a media vendor was paid late by Neo). In any event, Dodd Frank was not passed to protect Neo's client, but rather the public company's shareholders.

purchased.   Plaintiff contends that Neo knowingly delayed these payments and that it was improper to do so because this action somehow improved its cash flow.   Even assuming that Plaintiff is right about this, and that Neo did in fact pay the vendors slower than usual, the Complaint does not allege that such a practice resulted in any improper financial reporting, and thus there is no scenario under which this action could constitute a violation of securities laws. Media money is a pass-through expense that appears only on Neo's balance sheet and never hits Neo's P&L. Plaintiff's claim that Neo engaged in this process to improve its cash position in order to accrue executive bonuses and promotions is illogical, as he well knows, given his role as Finance Director, that bonuses are based on profit, not balance sheets.   Indeed, even if Neo improved its own cash flow and cash position as a result of holding this money a little longer, it would only serve to benefit shareholders of Neo's indirect parent and, in fact, its actions would be in line with accepted practices of companies in various industries – i.e., insurance companies that make money by delaying payments on claims.   Thus, from the face of the Complaint, it is clear that Plaintiff has not established, and cannot establish, that he reasonably believed Neo's action in delaying media payments to vendors constituted a fraud on Neo's indirect parent's shareholders.   Notably, the fact that Plaintiff could even purport to claim that any disclosure he made about these allegedly slow media payments was required or protected by securities laws demonstrates that none of his so-called disclosures were made with the good faith belief that Neo was violating any securities law.

Plaintiff next claims that Neo gave favorable payment terms to one particular client due to a personal relationship between the client and a senior executive.   Plaintiff alleges that when the client fell behind in making payments, Neo should have deemed it a "cash-in-advance" client and should have established an accounting reserve.   Again, even assuming Plaintiff is right about

this, it is absurd to think that this type of action, with respect to this one client, could be characterized as a securities law violation. Plaintiff will be hard pressed to find a securities law that restricts a company from using its judgment in working with a client to arrange payment terms, which is presumably why he has not even attempted to identify the law that was allegedly violated as a result of this action.

The third issue in Plaintiff's complaint concerns his belief that Neo was improperly recognizing revenue that was not yet permitted to be recognized. Plaintiff, however, fails to provide a single allegation in his Complaint that states what revenue was improperly recognized or why any alleged actions with respect to this revenue did not accord with GAAP (much less securities laws). Thus, the Complaint does not demonstrate that such unspecified action by one part of a small subsidiary of another subsidiary of a publicly-held company was designed to defraud shareholders. This is likely because a decision about when and how to accrue revenue is typically a judgment call based on experience and history. Moreover, the Complaint alleges that when Plaintiff expressed his point of view on these transactions, they were corrected to his satisfaction. Accordingly, his allegations fail to show that he had a reasonable belief that Neo took any action that was in violation of securities laws.

Similarly, with respect to the last issue, regarding the reversal of accounting reserves (*i.e.*, estimated year-end provisions for expenses), Plaintiff does not allege what reserves were allegedly improperly reversed. Indeed, he does nothing more than contend, in a conclusory fashion, that these transactions were intentionally fraudulent. As with the other three transactions, Plaintiff's allegations once again fail to demonstrate that Plaintiff had a reasonable belief that Neo was violating securities laws. Accordingly, as a matter of law and fact, this Court should dismiss Plaintiff's Dodd Frank anti-retaliation claim.

This Court should also dismiss Plaintiff's two contract claims. Plaintiff was an at-will employee. His attempt now to claim that policies exist that restrict Neo's right to terminate his employment are baseless because the handbook that contains the policies upon which he relies expressly states that no part of it is to be construed as a contract or guarantee of employment. This disclaimer negates any contractual protection that Plaintiff is now contending he has from the anti-retaliation policy in that same handbook. Thus, as a matter of law, Plaintiff has failed to state a claim either for breach of an express or an implied contract and this Court should dismiss Plaintiff's Complaint in its entirety.

## STATEMENT OF FACTS[3]

### A.     PLAINTIFF'S EMPLOYMENT WITH NEO

Neo is a media agency that provides a full range of digital and direct media services, including media strategy, planning and buying, search marketing, performance marketing, analytics and technology, mobile marketing, social media marketing, and digital out-of-home marketing. WPP Group USA, Inc. is a non-public indirect parent of Neo. WPP plc, the ultimate parent company, is the only publicly traded WPP entity. (Complaint ¶ 9.) It is not a defendant in this case.

Plaintiff worked for Neo as its Finance Director from October 12, 2010 until April 30, 2013. (*Id.* ¶¶ 3, 16-17.) In his position, Plaintiff "was responsible for the accuracy of Neo's financial reporting, and Neo's compliance with GAAP, and for compliance with WPP's accounting policies." (*Id.* ¶ 18.) In short, Plaintiff's responsibilities included reviewing accounting procedures and reports and, where appropriate, detecting and correcting errors. (*Id.* ¶¶ 1, 18.)

---

[3] The facts alleged in the Complaint are taken as true for the purpose of this motion only.

Plaintiff alleges that, in late 2012 and early 2013, he "asserted his authority as 'GAAP' (Generally Acceptable Accounting Principles) accounting director" when he detected and "attempt[ed] to correct several violations" of GAAP and WPP policy. (*Id.* ¶¶ 1, 33-43.) Specifically, the four transactions that Plaintiff believes are violations of GAAP and WPP policy are:

1. Delayed Media Payments

    In or around August 2012, Plaintiff "determined that NEO was purchasing advertising for NEO clients, and <u>knowingly</u> delaying payments to the media companies that run the advertisements. The result was that Neo was improperly holding client money, and improving its own cash flow and cash position." (*Id.* ¶ 33; emphasis in original.) It is alleged that "Neo was focusing this improper practice on a very large Neo client ..." and that "[t]his practice intentionally harmed [that client] because Neo was able to hold onto and utilize [that client]'s capital for its own purposes...." (*Id.* ¶¶ 34-35.) "Plaintiff objected to these practices – reported them to his supervisors – and caused them to be reviewed and corrected by WPP finance and compliance officers." (*Id.* ¶ 36.) This transaction shall be referred to as the "<u>Delayed Media Payments</u>."

2. Improperly Recognized Revenues

    In January 2013, Plaintiff discovered that a Neo Executive, Bradley Rogers, "attempted to execute certain accounting transactions that would improperly, and fraudulently, improve the financial results of Neo ... [by] improperly recognizing revenues that were not yet permitted to be recognized under GAAP or WPP policies." (*Id.* ¶ 37.) Plaintiff alleges that this was done "to falsely inflate Neo's profits so that, pursuant to WPP policies, Neo would be allowed to accrue executive bonus compensation, [and] implement employee promotions." (*Id.*) "Plaintiff objected to those accounting transactions – reported them to his supervisors – and caused them to be cancelled." (*Id.* ¶ 38.) This transaction shall be referred to as the "<u>Improperly Recognized Revenues</u>."

3. Reversed Accounting Reserves

    In February 2013, Bradley Rogers "attempted to execute certain accounting transactions that would improperly and fraudulently 'reverse' accounting reserves directly into Neo's profits." (*Id.* ¶ 40.) Plaintiff "once attempted to prevent these accounting transactions; however ... Neo was successful in reporting such fraudulent accounting results to WPP ... [but] one or more

accounting officers of Defendants over-ruled Plaintiff and permitted Neo to record these improper and fraudulent accounting transactions." (*Id.* ¶ 41.) "By reason of these improper accounting transactions, Neo was permitted to accrue executive bonuses, and employment [*sic*] employee promotions." (*Id.* ¶ 42.) This transaction shall be referred to as the "Reversed Accounting Reserves."

4. Favorable Payment Terms

In March 2013, "a senior level executive attempted to obtain favorable and 'lenient' payment terms for a client with whom he has a personal relationship. When it became known that the client had become a collection issue for Neo, Plaintiff reported that the client was required, under WPP policies, to be deemed a 'cash in advance' client … [and] when it became known that the client was over 5 months late in paying invoices, and was disputing a portion of the owed amount, an accounting reserve should have been immediately established within the March 2013 financial statement." (*Id.* ¶ 43.) This transaction shall be referred to as the "Favorable Payment Terms."

Notably, Plaintiff does not allege that the reporting of any of these transactions are required or protected under "the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq)., the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq)., including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of title 18, United States Code, and any other law, rule, or regulation subject to the jurisdiction of the Commission" (collectively, the "Covered Laws"). (*See* Complaint ¶¶ 32-43.)

Neo terminated Plaintiff's employment, effective April 30, 2013, due to consolidation of the finance team. (*Id.* ¶¶ 17, 44, 66.) Plaintiff does not allege who decided to terminate his employment or who communicated the termination, but claims the reason given was pretextual. (*Id.* ¶ 66.)

Plaintiff alleges that, sometime *after his termination*, he first notified the "Chief Financial Officer-North America of Ogilvy & Mather" in an effort to "cause Neo to comply with GAAP, WPP policies, and law." (*Id.* ¶ 51.) The Complaint does not state when Plaintiff made this alleged notification, nor is there an allegation regarding the content of such notification. It is

indisputable, however, that Plaintiff's termination could not have been in retaliation for this report because it occurred *after his employment had been terminated.*

Plaintiff also alleges that, *after his termination,* he "continued his efforts of correcting Neo's accounting fraud by communicating, through his counsel, to Defendants counsel." (*Id.* ¶ 53.) The first of these "efforts" came in the form of a letter from Plaintiff's counsel, Richard Meisner, dated May 6, 2013. (Brochin Aff., Exh. B.) In the letter, Mr. Meisner first explained that Plaintiff "intends to file a lawsuit if his demands are not promptly met." (*Id.*) Mr. Meisner demanded a prompt response to his letter, by May 10, 2013, and threatened that if he didn't receive one, he would contact the WPP Audit Committee. (*Id.*)

Two months later, however, on July 2, 2013, Mr. Meisner contacted counsel for Defendants and again threatened that if Plaintiff's demands were not accepted immediately, Plaintiff would report his allegations to the WPP Audit Committee and file a federal lawsuit. (Brochin Aff., Exh. C.) Mr. Meisner also stated that WPP cross-business recruiters had stopped communicating with Plaintiff. (*Id.*)

On July 25, 2013, Mr. Meisner again wrote to Mr. Brochin, confirming that Mr. Brochin had informed him that the WPP Audit Committee had been notified of Plaintiff's allegations. Mr. Meisner demanded additional information about the notification. (Brochin Aff., Exh. D.) Mr. Meisner indicated that if he did not receive a response within five days, he would notify the WPP Audit Committee directly. (*Id.*) Notably, the draft correspondence attached to Mr. Meisner's July 25, 2013 letter to Mr. Brochin (a draft letter to the WPP Audit Committee) stated that "Mr. Berman has done everything within his power to bring information relating to material accounting irregularities to the attention of WPP because he is required to do so in accordance with the WPP Code of Conduct and his ethical obligations as an U.S. certified public

accountant." (*Id.*) It is undisputed, however, that, as of July 25, 2013, Mr. Berman had not sent any prior correspondence to or communicated with the WPP Audit Committee or provided any information via the Ethics Hotline.

On August 12, 2013, over three months after Plaintiff's termination and more than a month after WPP allegedly stopped corresponding with Plaintiff about another position, Plaintiff first reported his allegations to the WPP Audit Committee. (Complaint ¶ 55; Brochin Aff., Exh. E.) He did so by sending the same letter that he had attached to his July 25 letter. Thereafter, Plaintiff and his counsel met with the Head of Internal Audit for The Americas.

On October 16, 2013, after Plaintiff had met with the Head of Internal Audit, Mr. Meisner sent Mr. Brochin a draft complaint in this matter. (Complaint ¶ 57; Brochin Aff., Exh. F.) Paragraph 57 of the draft complaint stated that Plaintiff had reported his allegations to the SEC, but the date of such reporting conspicuously was left blank, as he had not yet made such report. (Brochin Aff., Exh. F.) On November 22, 2013, Mr. Meisner sent another partial draft of the complaint, this time filling in the blank from the prior draft complaint and stating that Plaintiff had reported his allegations to the SEC, *for the first time* on October 31, 2013, six months after his termination. This new draft complaint added another allegation indicating that Plaintiff intended to contact Neo's biggest client in December 2013 to report his allegations. (Brochin Aff., Exh. G.) Notably, the allegation regarding this client was not included in the final Complaint filed in this matter, in late January 2014, and there is no allegation that Plaintiff ever followed through on his threat to contact this client regarding his alleged concerns.

## B.   DEFENDANTS' POLICIES

Plaintiff claims that his termination was a breach of "Defendants' policies and codes of conduct and ethics" and, therefore, a breach of an express and implied contract prohibiting

retaliation.  (Complaint ¶¶ 82-95.)  The Ogilvy & Mather U.S. Employee Handbook, which

applies to Neo employees, states:

> No provision of this handbook is to be construed as a contract or guarantee of employment or a contract or guarantee of the terms and conditions of employment.  Although we hope that your employment here will be mutually rewarding, both you and Ogilvy retain the right to end the employment relationship at any time and for any reason with or without cause or notice. Please understand that no one except a duly authorized company employee has the authority to enter into an agreement with you for employment for any specified period or to make any promises or commitments contrary to the foregoing.

(Brochin Aff., Exh. H, p. 1.)

The handbook also contains an extensive section on Ethics and Principles of Professional

Conduct, which includes contact information for the company's Ethics Hotline where employees

may ask questions or file complaints; and may do so anonymously.   The policy prohibits

retaliation against any individual who uses the Hotline.  (*Id.*, pp. 22-28.)

## ARGUMENT

I.    **THE LEGAL STANDARD**

"To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to

relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

facially plausible claim is one where "the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Where the court finds well pleaded factual

allegations, it should assume their veracity and determine whether they "plausibly give rise to an

entitlement to relief."  *Id.* at 679.

It is well settled that, in deciding a motion to dismiss:

> [T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.

*Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).  Additionally, courts may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" where the plaintiff "reli[ed] on the terms and effect of a document in drafting the complaint." *Chambers*, 282 F.3d at 153 (internal quotations and citation omitted).  And while "a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are integral to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading."  *Glaxosmithkline LLC v. Beede*, 1:13-cv-00001 (MAD/RFT), 2014 U.S. Dist. LEXIS 28663, at *8-9 (N.D.N.Y. Mar. 6, 2014); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.") (citations and internal quotations omitted).

## II.    ADMISSIONS IN THE COMPLAINT AND THE DOCUMENTS REFERENCED THEREIN DEMONSTRATE THAT THIS COURT SHOULD DISMISS PLAINTIFF'S DODD FRANK ANTI-RETALIATION CLAIM

Plaintiff has failed to state a claim for whistleblower retaliation under Section 922 of Dodd Frank because (1) he was not a whistleblower as defined by the Act at the time of the alleged adverse actions, since he had not reported any violations to the SEC, and (2) he did not have a subjectively or objectively reasonable belief that any alleged conduct constituted a violation of the Covered Laws.

A.    **PLAINTIFF WAS NOT A WHISTLEBLOWER UNDER DODD FRANK AT THE TIME OF ANY ALLEGED ADVERSE ACTIONS, AS HE HAD NOT REPORTED ANY VIOLATIONS TO THE SEC**

Plaintiff admits that he first provided information to the SEC many months after his employment was terminated and after cross-business recruiters had allegedly ceased communicating with him.  As such, Plaintiff was not a "whistleblower" under Dodd Frank when Defendants allegedly retaliated against him.

Dodd Frank defines a "whistleblower" to mean "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws *to the Commission*, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6) (2014) (emphasis added).  Thus, under Dodd Frank, any time where the term "whistleblower" appears, it refers to an individual (or multiple individuals acting jointly) who has provided information to the SEC.

The Dodd Frank prohibition against retaliation states:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, *a whistleblower* in the terms and conditions of employment because of any lawful act done by *the whistleblower* —
>
> (i)  in providing information to the Commission in accordance with this section;
>
> (ii)  in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii)  in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of title 18, United States Code, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A) (emphasis added).

13

Accordingly, it is clear on the face of the statute that Dodd Frank protects from retaliation only those individuals who have provided information to the SEC. The SEC, however, has attempted to read out the phrase "to the Commission" from the statutory language through its regulations.[4] But, as noted in *Asadi v. G.E. Energy (USA), L.L.C*, this expanded interpretation of the term "whistleblower" is not entitled to deference by the courts, and properly can be disregarded, "[b]ecause Congress has directly addressed the precise question at issue." *Asadi*, 720 F.3d at 630. In *Asadi*, the Fifth Circuit recognized that "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44, (1984)).[5]

Indeed, nothing in the statutory language is ambiguous or unclear. The courts that have found an ambiguity have latched onto the language in (iii) of 15 USCS § 78u-6(h)(1)(A) and ruled that the statute protects employees who make "disclosures required or protected under the

---

[4] The SEC's regulations states that "For purposes of the anti-retaliation protections [under Dodd Frank], you are a whistleblower if: (i) You possess a reasonable belief that the information you are providing relates to a possible securities law violation ... that has occurred, is ongoing, or is about to occur, and; (ii) You provide that information in a manner described in Section 21F(h)(1)(A) of the Exchange Act (15 U.S.C. 78u-6(h)(1)(A))." 17 C.F.R. § 240.21F-2(b)(1).

[5] Defendants acknowledge the multiple district court decisions that, relying in large part on this SEC regulation and an alleged ambiguity in the statutory language, have held that the expanded definition of "whistleblower" should be used to determine whether an individual is protected from retaliation under Dodd Frank. However, Defendants believe that the position taken by the Fifth Circuit in *Asadi*, which is the only Court of Appeals to rule on the issue, and whose decision has been relied upon by other district courts, is the correct one. Furthermore, there is only one post-*Asadi* Southern District decision that holds that an individual can be a whistleblower under Dodd Frank if he does not make protected disclosures to the SEC. *See Rosenblum v. Thomson Reuters (Markets) LLC*, 13 Civ. 2219 (SAS), 2013 U.S. Dist. LEXIS 153635 (S.D.N.Y. Oct. 25, 2013). The Courts in the other Southern District cases that cite *Asadi* did not base their holdings on the same ground as *Asadi*. *See Liu v. Siemens A.G.*, 13 Civ. 317 (WHP), 2013 U.S. Dist. LEXIS 151005 (S.D.N.Y. Oct. 21, 2013) (dismissing plaintiff's complaint based on findings that the Dodd Frank anti-retaliation provision does not apply extraterritorially and that section 806 of SOX does not require or protect disclosures of FCPA violations) and *Ahmad v. Morgan Stanley & Co., Inc.*, 13 Civ. 6394 (PAE), 2014 U.S. Dist. LEXIS 23543 (S.D.N.Y. Feb. 21, 2014) (dismissing plaintiff's complaint based on findings that Dodd Frank's whistleblower protection provision is not retroactive and the plaintiff had not alleged retaliation after the effective date of Dodd Frank). These decisions are not binding on this Court and this issue has not yet been addressed by the Second Circuit or the Supreme Court. This issue, however, is currently pending before the Second Circuit in the *Liu v. Siemens* case.

securities laws," which includes provisions of SOX that do not require SEC reporting. But, as the Fifth Circuit held, Dodd Frank's anti-retaliation protection merely codifies that, if an individual is a "whistleblower" (i.e. has provided information to the SEC), but is terminated for some *other* "required or protected disclosure," then that individual will still be entitled to whistleblower retaliation protection under Dodd Frank. That is, the individual retains the "whistleblower" status even if he or she is terminated based on a required or protected disclosure other than that person's provision of information to the SEC. This Court should carefully consider the potential harm if enforcement agencies are permitted to override the clear language established by Congress based on an alleged, but nonexistent ambiguity. An expansion of the term "whistleblower" should be addressed by amending the legislation; this is not a matter of mere interpretation.

Moreover, even the SEC's own regulations are contradictory. As the Fifth Circuit noted, "[w]hile 17 C.F.R. § 240.21F-2(b)(1) appears to adopt a broader definition of 'whistleblower,' … 17 C.F.R. § 240.21F-9, which governs the procedures for submitting original information to the SEC, explicitly requires that an individual submit information about a possible securities law violation to the SEC" in order to be considered a "whistleblower." *Id.*[6] Accordingly, the SEC's own regulations provide further support that the whistleblower-retaliation protections afforded by Dodd Frank apply only to those individuals who have provided information to the Commission.

In sum, as the Fifth Circuit held, the plain language of the Act "creates a private cause of action only for individuals who provide information relating to a violation of the securities law to

---

[6] 17 C.F.R. § 240.21F-9 states that "To be considered a whistleblower under [Dodd Frank], you must submit your information about a possible securities law violation by either of these methods: (1) Online, through the Commission's Web site located at http://www.sec.gov; or (2) By mailing or faxing a Form TCR (Tip, Complaint or Referral) … to the SEC Office of the Whistleblower…"

the SEC." *Asadi*, 720 F.3d at 623; *see also Banko v. Apple Inc.*, No. CV 13-02977 RS, 2013 U.S. Dist. LEXIS 149686, at *13-14 (N.D. Cal. Sept. 27, 2013) (holding that "the statute is not ambiguous; the 'whistleblower protection' provided by Section 78u-6(h) is only available to individuals who meet the Dodd-Frank definition of 'whistleblower' found in Section 78u-6(a). To conclude to the contrary, one would have to ignore several canons of statutory interpretation."). Thus, where the statute is clear and unambiguous, as here, the Court need look no further to interpret and apply the statute. *See Wagner v. Bank of Am. Corp.*, Civil Action No. 12-cv-00381-RBJ, 2013 U.S. Dist. LEXIS 101297, at *14 (D. Colo. July 19, 2013) (dismissing Dodd Frank claim based on only internal reporting of alleged fraud). Accordingly, an individual who fails to report a violation to the SEC cannot sustain an action for whistleblower retaliation under Dodd Frank.

The rationale behind this makes sense. As the court noted in *Asadi*, individuals who provide reports to supervisory employees, but ***do not report to the SEC***, would not need Dodd Frank because they would still be protected from retaliation under SOX. *See* 18 U.S.C. § 1514A; *see also Asadi*, 720 F.3d at 629-30. To permit individuals to claim whistleblower status under Dodd Frank without providing information to the SEC would, in essence, moot the administrative requirements under SOX because those individuals could recover larger damages and do so without providing information to any governmental agency. *Id.* This is precisely what Plaintiff is attempting to do in the instant case. Given the clear, unambiguous statutory language of Dodd Frank, however, Congress' intent was that a whistleblower either needs to (i) provide information to the SEC (pursuant to Dodd Frank) or (ii) file a complaint with the Secretary of Labor (pursuant to SOX). To conclude otherwise would eviscerate Congress' intent to have

potential violations of securities laws addressed by appropriate regulatory agencies before bringing them to the courts.

Here, it is undisputed that the alleged adverse actions taken against Plaintiff occurred well before he made any reports to the SEC. Plaintiff was terminated effective April 30, 2013, and claims that recruiters stopped corresponding with him in or around July 2013. Plaintiff did not report his concerns to the SEC until October 31, 2013, several months after both alleged adverse actions and only after Defendants refused to give in to Plaintiff's threats and demands. Under the plain language of Dodd Frank, Plaintiff simply was not a whistleblower at the time any alleged retaliatory conduct occurred, and accordingly, this Court should dismiss his Dodd Frank anti-retaliation claim.

**B. PLAINTIFF DID NOT HAVE A REASONABLE BELIEF THAT ANY OF THE ALLEGED VIOLATIONS CONSTITUTED SECURITIES LAW VIOLATIONS**

*(i) Plaintiff Has the Burden to Establish His Reasonable Belief or He Cannot State a Prima Facie Case of Retaliation*

Even assuming this Court accepts the SEC's expansion of the term "whistleblower" under Dodd Frank, the SEC has nonetheless made clear that, regardless of whether or not an individual reports information to the Commission, that individual will not be deemed a whistleblower protected against retaliation unless:

(i) You possess a reasonable belief that the information you are providing relates to a possible securities law violation … that has occurred, is ongoing, or is about to occur, and;

(ii) You provide that information in a manner described in Section 21F(h)(1)(A) of the Exchange Act (15 U.S.C. § 78u-6(h)(1)(A)).

17 C.F.R. § 240.21F-2.

Accordingly, even if Plaintiff's failure to provide information to the SEC prior to the adverse employment actions alleged in the Complaint is not fatal to his claims, Plaintiff is not entitled to any whistleblower retaliation protection unless he can establish a *reasonable belief* that the actions complained of were *violations of securities law*. He has not done so. Nowhere in the Complaint does Plaintiff allege (i) why Defendants' actions constituted violations of securities laws; or (ii) sufficient information for Defendants, or this Court, to fill in the blanks for him. Instead, Plaintiff relies on conclusory allegations as follows:

- With respect to the Delayed Media Payments, Plaintiff alleges only that they were "intended to permit Neo to circumvent GAAP accounting and WPP policies" and "possibly in violation of law." (*See* Complaint ¶¶ 33, 35.) Circumventing GAAP and violating WPP policies are not alleged violations of the Covered Laws. Accordingly, all Plaintiff has alleged is that the Delayed Media Payments "possibly" violate the law, which, as demonstrated below, is wholly insufficient to establish his reasonable belief, particularly in light of Plaintiff's education and training as a Finance Director. Moreover, Plaintiff admits that these practices were "reviewed and corrected" after he objected to them. (*Id.* ¶ 36.)

- With respect to the Improperly Recognized Revenues, Plaintiff alleges only that they were "intended to permit Neo to circumvent GAAP accounting, and further circumvent WPP policies." (*See Id.* ¶ 37.) Plaintiff does not allege what revenues were set to be improperly recognized. (*See Id.* ¶¶ 37-39.) He also does not allege that these practices even "possibly" violated the law. And,

again, Plaintiff admits that he "caused [these transactions] to be cancelled" when he objected to them. (*Id.* ¶ 38.)[7]

- With respect to the Reversed Accounting Reserves – i.e., the year-end provisions regarding estimated business expenses – Plaintiff alleges only that they were "intended to permit Neo to circumvent GAAP accounting, and further circumvent WPP policies." (*See Id.* ¶ 40.)  Plaintiff does not allege what accounting reserves were "reversed."   Moreover, Plaintiff does not allege that he reported the Reversed Accounting Reserves to his supervisors or to WPP.   And, he also does not allege that these practices even "possibly" violated the law. (*See Id.* ¶¶ 40-42.)

- With respect to the Favorable Payment Terms, Plaintiff alleges that the client should have been deemed a "cash in advance" client and that an accounting reserve should have been immediately established. (*See Id.* ¶ 43.)  However, Plaintiff does not allege that the Favorable Payment Terms violated any law, nor does he allege that he reported the Favorable Payment Terms to his supervisors.   In fact, he does not even allege that Defendants failed to deem the client a "cash in advance" client or that an accounting reserve was not created.

Even assuming his allegations are true, Plaintiff does not establish any reasonable belief that he made protected disclosures relating "to a possible securities law violation" because he

---

[7] It is not surprising that Plaintiffs' allegations regarding the Improperly Recognized Revenues and the Reversed Accounting Reserves lack any specificity at all.  If he had been specific, Defendants would have been able to explain why Plaintiff could not have reasonably believed that these issues constituted violations of Covered Laws, just as this memorandum of law does with respect to the two issues for which Plaintiff provided some information.  The law does not allow Plaintiff to make his Complaint so vague and devoid of details that Defendants cannot point out its deficiencies.

does not so much as allege that any of these actions violated such laws. Thus, the Complaint plainly fails to state a *prima facie* case that Plaintiff is entitled to whistleblower retaliation protection under Dodd Frank.

In fact, the only two instances identified in the Complaint for which Plaintiff provides any detail at all (the Delayed Media Payments and the Favorable Payment Terms) could never constitute violations of securities laws. With respect to the Delayed Media Payments, it is undisputed that Neo receives money from its biggest client, and other clients, in order to purchase advertising from third party vendors on their behalf. Neo informs the client how much this advertising will cost, and the client gives Neo the appropriate money to cover those costs. Plaintiff alleges that Neo did not pay the third party vendors quickly enough, and would instead wait until these vendors complained that they were owed money. When a vendor complained, it was promptly paid. (*See Id.* ¶ 34.) Plaintiff alleges that Neo engaged in this practice to "improve[ ] its own cash flow and cash position." (*See Id.* ¶ 33.) Plaintiff does not allege that Neo overcharged or fraudulently billed its clients in any way, that Neo paid less than the amount billed by the vendor, or that its allegedly improved cash flow and cash position were improperly reported in its financials. In other words, if Plaintiff's allegations were correct (which they are not), then all that might have happened is that Neo earned interest while it held the money, thereby earning more money for its indirect parent's shareholders, and then correctly reported the additional interest with its other income. Accordingly, the entirety of this allegation, which Plaintiff, a highly trained and educated Finance Director believes "possibly" violated the law, is that Neo did not pay vendors quickly enough for his liking. Nothing about the alleged Delayed Media Payments, even if true, did result, or could reasonably have been anticipated to result, in any improper financial reporting, or in any way have affected Neo's clients or any shareholders

or rendered anyone's books inaccurate.  As such, there is no basis whatsoever to allege that this practice violated any applicable securities laws.

Plaintiff's allegations with respect to the Favorable Payment Terms are similarly unreasonable.  Plaintiff alleges that a senior executive attempted to obtain "lenient" payment terms for a client due to that executive's personal relationship with such client. (*See Id.* ¶ 43.) Plaintiff alleges that because the client had this personal relationship, and was not a reliable client, the client fell over five months behind in paying invoices and disputed a portion of the amount owed.  (*Id.*)  Accordingly, the entirety of this allegation is that because an executive allowed personal feelings to get in the way of his or her business judgment, Neo entered into a contract with an unreliable client.  There is no allegation that Neo did not properly bill the client for work performed, that any financial information was improperly reported or that any fraudulent activity occurred.  Instead, Plaintiff alleges that, based on the collection issue, the client should have been deemed a "cash in advance" client and that an accounting reserve should have been established.  First, there is no requirement under any Covered Laws that such actions be taken.  And, second, Plaintiff does not even allege that these steps were not taken. (*See Id.* ¶ 43.)  In short, Plaintiff alleges that Neo made a bad business decision by offering better terms to a personal friend.  The securities laws are not intended to – and do not – prohibit bad business decisions.  Accordingly, there is no basis whatsoever for Plaintiff to "reasonably believe" that such a practice would violate securities laws.

### (ii)   Plaintiff's Conclusory Allegations are Insufficient to Establish His Reasonable Belief That Defendants' Actions Violated Securities Laws

The Complaint contains nothing more than conclusory allegations to support Plaintiff's claims.  He repeats the conclusory allegations that actions were taken "in violation of policy, law and GAAP" or "Sarbanes Oxley, Dodd Frank and U.S. Securities laws" without specifying the

actions taken, how they allegedly violate those laws or that he reported these allegedly unlawful actions. (*See Id.* ¶¶ 20-26.) This is insufficient to establish Plaintiff's reasonable belief. *See Day v. Staples, Inc.*, 555 F.3d 42, 57 (1st Cir. 2009) (reviewing a whistleblower complaint under SOX and noting that "merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability [for securities fraud]. Even when a company's accounting method is in violation of GAAP, some techniques can prove to be entirely legitimate, depending on the specific facts. Claims that there has been accounting fraud thus require evidence beyond a belief in a mere accounting irregularity.") (internal quotations and citations omitted).

When he finally does discuss any specific factual allegations, he alleges only that one of the four transactions – the Delayed Media Payments, which as demonstrated above could not have violated any securities laws, nor could Plaintiff have reasonably believed that that they did – might "possibly" violate the law. Plaintiff's mere conclusory allegations are insufficient to defeat a motion to dismiss. *See In re: Commodity Exch. Inc., Silver Futures & Options Trading Litig.*, 11 Md. 2213 (RPP), 2012 U.S. Dist. LEXIS 181487, at *78 (S.D.N.Y. Dec. 21, 2012) (granting motion to dismiss because complaint provided only conclusory allegations); *Roganti v. Metro. Life Ins. Co.*, 12 Civ. 0161 (PAE), 2012 U.S. Dist. LEXIS 84939, at *9 (S.D.N.Y. June 19, 2012) (holding that, in order to survive a motion to dismiss, a plaintiff must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests[, and] cannot, however, state merely conclusory allegations, but must, instead, plead more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotations and citations omitted); *Egan v. TradingScreen, Inc.*, 10 Civ. 8202 (LBS), 2011 U.S. Dist. LEXIS 103416, at *5-6 (S.D.N.Y. Sept. 12, 2011) ("The tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (internal quotations and citation omitted).

### (iii)     *Plaintiff's Belief That the Allegations Violated Securities Laws is Particularly Unreasonable Given His Education and Training*

Plaintiff's Complaint should be held to a higher standard than a typical layperson given his background and training.   Plaintiff was the Finance Director for Neo with sophisticated knowledge of GAAP, accounting policies and financial reporting.   (*See* Complaint ¶¶ 16-19.) Accordingly, he should be able to identify specific actions that constitute violations of securities laws and explain why those actions would constitute violations of law.   Plaintiff, however, merely makes generic statements that he "reasonably believed" that "officers were violating GAAP, Sarbanes Oxley, Dodd Frank and U.S. Securities Laws." (*Id.* ¶ 24.) Given his understanding of financial reporting and a company's legal obligations under these laws, Plaintiff should have been able to identify specific alleged violations, but he does not. *See, e.g., Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs., P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013) (stating that, with respect to retaliation allegations for alleged protected activity, "[t]he reasonableness of [an employee's] belief is to be assessed in light of the totality of the circumstances.") (quoting *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *De Los Santos v. City of New York*, 482 F. Supp. 2d 346, 355 (S.D.N.Y. 2007) (same).

While this is particularly true with respect to the Delayed Media Payments and Favorable Payment Terms, the fact that Berman could even make those claims together with his attempts to use threats to complain to Neo's client (not to mention the SEC) when his other threats did not get him the payoff he wanted, demonstrates that none of the issues he now retroactively relies on

are based on any good faith belief by him that Neo violated any securities laws.  As described *supra*, there is no possibility that Plaintiff, a highly trained Finance Director, could reasonably believe that not paying vendors quickly, or that entering into an agreement with an unreliable client, violates securities laws.   Given his knowledge of GAAP, policy and the law, any purported belief that these actions violated securities law is entirely unreasonable.

Moreover, the fact that the alleged accounting violations were identified and, in most cases, admittedly corrected by Plaintiff, indicates that he knew that the alleged violations were nothing more than subjective accounting decisions open to differing opinions under GAAP.  This case is indistinguishable from the matter of *Williams-Wilson v. NDC Health Corp.*, no. 2005-SOX-00097, 2007 DOLSOX LEXIS 4 (US Dep't of Labor Jan. 31, 2007), in which the U.S. Department of Labor held that an employee was not a whistleblower where she merely identified and corrected accounting errors in the normal course of her job.  In the *Williams-Wilson* matter, the Complainant was a financial analyst, responsible for finding accounting errors and reporting the errors to management to be corrected.  *Id.* at *8-9.  During the course of her employment, she identified and reported that certain individuals "attempted to circumvent Employer's system of internal controls by 'lack of segregation between auditing and billing functions within billing, recognizing revenues before services were performed, a lack of contract back up for NDC charges to customers, questionable management competence, over-billing and under-billing errors.'"  *Id.* at *7-8.   Like Plaintiff, the *Williams-Wilson* Complainant reported alleged violations of internal policies, rather than violations of the Covered Laws.  Indeed, the words Plaintiff uses to state his so-called disclosures are virtually identical to those rejected by the DOL, namely, "attempting to circumvent Employer's system of internal controls [compliance with WPP's policies] [and] recognizing revenues before services were performed."  The DOL

held that Complainant's reporting of "what she perceived as questionable financial actions…was her duty as a financial analyst. Without the additional indication by her that she believed that these discrepancies involved a violation of one of the six protected areas of the [Sarbanes-Oxley] Act, her reporting activities did not rise to the level of 'protected activity' under the Act." *Id.* at *39-40.

The same is true here. Plaintiff claims he raised issues of accounting errors that possibly violated company policy and GAAP procedures, which was part of his normal duties. He does not claim that he reported that the alleged errors violated the Covered Laws, securities laws in general, or constituted shareholder fraud. This is because, as an expert in the field, Plaintiff had no reasonable belief that such errors could be a violation of the Covered Laws. His general complaints to his supervisor and coworkers and vague allegations in the Complaint are insufficient to support his claim that he had a reasonable belief that such conduct violated the Covered Laws and, thus, his conduct does not rise to the level of protected activity. Like the *Williams-Wilson* matter, Plaintiff's case should be dismissed as he did not engage in protected activity.

     *(iv)*     ***Plaintiff's Bad Faith Wholly Undermines Any Allegation That He had a Reasonable Belief that Securities Laws Might Have Been Violated***

After reviewing the allegations in the Complaint in conjunction with the correspondence from Plaintiff's counsel, it is clear that Plaintiff did not "reasonably believe" that any securities laws violations had occurred, but instead that he needed to concoct some legal theory in order to leverage a settlement payment from Defendants. Plaintiff does not so much as allege in the Complaint that he reported the Reversed Accounting Reserves or the Favorable Payment Terms to his supervisors. However, conveniently, he now claims that he reasonably believed that these were fraudulent activities that could constitute securities law violations. And, with respect to all

of his allegations, he did not notify the WPP Audit Committee or the SEC of any alleged improprieties until well after his termination, and even then only after his initial settlement demands were rejected. If Plaintiff actually thought that Defendants' actions violated securities laws, why did he not immediately bring them to the attention of the appropriate internal or external entities? And why did he waste time sending correspondence through his counsel demanding payments rather than reporting these alleged violations? The Complaint is littered with allegations that Neo's practices violated "policy," yet Plaintiff never once contacted the Ethics Hotline, which number is provided in those same policies. Instead, it is clear that Plaintiff needed some cognizable threat to extract payment from his former employer. This Court should not reward his indisputable bad faith, as Plaintiff's actions make clear that he never "reasonably believed" that securities laws had been violated, and that he was careful never to go to the SEC until his other options to obtain a settlement payment had been exhausted.

## III.   COUNTS TWO AND THREE FAIL TO STATE CLAIMS FOR BREACH OF AN EXPRESS OR IMPLIED CONTRACT

Plaintiff fails to state claims for breach of an express or implied contract because the very policies and codes of conduct on which Plaintiff relies contain a specific disclaimer which expressly and unambiguously disavows the establishment of a contract and any limitation on Defendants' right to terminate Plaintiff's employment.

It is well established under New York law that an employment relationship of an unspecified duration is "presumed to be a hiring at will that may be freely terminated by either party at any time for any reason or even for no reason." *Lobosco v. N.Y. Tel. Co./NYNEX*, 96 N.Y.2d 312, 316 (2001) (citing *Martin v. N.Y. Life Ins. Co.*, 148 N.Y. 117, 121 (1895); *see also Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85 (2d Cir. 2001); *Horn v. New York Times*, 100 N.Y.2d 85, 90-91 (2003); *Rooney v. Tyson*, 91 N.Y.2d 685, 690 (1998); *Murphy v. Am. Home*

*Prods. Corp.*, 58 N.Y.2d 293, 305 (1983).  Notwithstanding the foregoing, a plaintiff may rebut this presumption by establishing that the employer has expressly limited its right to terminate an at-will employee.  *Baron*, 271 F.3d at 85; *see also v. Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 336 (1987); *Miller v. Huntington Hosp.*, 15 A.D.3d 548, 549 (2d Dep't 2005); *Sharkey v. J.P. Morgan Chase & Co.*, 10 Civ. 3824, 2010 U.S. Dist. LEXIS 139761, at *20 (S.D.N.Y. Jan. 14, 2011).

Here, Plaintiff has not alleged the existence of any documentation evidencing the notion that his employment was for a fixed duration.  Instead, he relies on the anti-retaliation provisions of Defendants' policies and codes of conduct and ethics to establish a limitation on Defendants' right to terminate his employment in support of his claims for breach of both express and implied contract.

Under New York law, "[t]o establish that [an employer's policies] are a part of [an] employment contract, an employee alleging a breach of implied contract must prove that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment."  *Baron*, 271 F.3d at 85 (quoting *Lobosco*, 96 N.Y.2d at 316).  The Second Circuit has explained that, "[t]he New York Court of Appeals has admonished that this is a 'difficult pleading burden' and that '[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements.'"  *Sharkey*, 2010 U.S. Dist. LEXIS 139761, at *20-21 (citation omitted).

Plaintiff's express and implied contract claims fail because the Ogilvy & Mather U.S. Employee Handbook (the "Handbook"), which contains Defendants' policies and codes of

conduct and ethics, does not constitute "a written express limitation on the [Defendants'] right to hire, fire, promote, demote, transfer or take any other employment action it deems otherwise appropriate." *See Baron*, 271 F.3d at 85. To the contrary, the Handbook contains a disclaimer that expressly and specifically renounces any intent on Defendants' part to accept contractual limitations on its rights as an at-will employer. (Brochin Aff., Exh. H, p. 1. ("No provision of this handbook is to be construed as a contract or guarantee of employment or a contract or guarantee of the terms and conditions of employment. … Please understand that no one except a duly authorized company employee has the authority to enter into an agreement with you for employment for any specified period or to make any promises or commitments contrary to the foregoing.").)

A "plaintiff cannot reasonably impose an express or implied contractual obligation on [its employer] that would limit its right to terminate plaintiff's employment" where the employer "has made clear through its employee manual – upon which plaintiff claims reliance – that it may terminate employment." *Lobosco*, 96 N.Y.2d at 316-317. In fact, "[a]n employee seeking to rely on a provision arguably creating a promise *must also be held to reliance on the disclaimer*." *Id.* (emphasis added); *see also Baron*, 271 F.3d at 85-86; *Sharkey*, 2010 U.S. Dist. LEXIS 139761, at *21 ("[w]here a manual or policy statement contains a disclaimer that nothing in the manual is intended to create a contract, an employee cannot bring a breach of contract claim based on [that same] manual or policy statement").

Plaintiff claims that his termination was a breach of Defendants' policies and codes of conduct and ethics prohibiting retaliation. The Handbook, however, which contains such policies and codes, also provides that "[n]o provision of this handbook is to be construed as a contract or guarantee of employment or a contract or guarantee of the terms and conditions of

28

employment," and explicitly reserved the Defendants' right to terminate an employee at any time and for any reason, with or without cause or notice. Therefore, even though the Handbook contains anti-retaliation provisions, the express disclaimer [on the first page of the handbook] "prevents the creation of a contract and negates any protection from termination plaintiff may have inferred from the [handbook's anti-retaliation] policy." *Lobosco*, 96 N.Y.2d at 317; *see also Baron*, 271 F.3d at 88 ("where a sufficiently unambiguous disclaimer, conspicuously placed in the employee handbook such that the employee reasonably could be expected to read it is at issue ... the implied contract claim may be dismissed as a matter of law"). In other words, Plaintiff cannot bring a claim for breach of contract based on one portion of the Handbook where another portion of that same Handbook expressly disclaims the creation of a contract at all. *See e.g., Baron*, 271 F.3d at 85.

Furthermore, the Handbook provides that only "a duly authorized company employee has the authority to enter into an agreement with [an employee] for employment for any specified period or to make any promises or commitments contrary to the foregoing." (Brochin Aff., Exh. H, p. 1.) Plaintiff has provided no indication that such an agreement was entered into, nor has he claimed that a company employee, whether duly authorized or not, made any promises or commitments to him specifying that his employment relationship with the Defendants would be anything other than at-will. *See e.g., Lobosco*, 96 N.Y.2d at 316-317.

Accordingly, Plaintiff's claims for breach of express and implied contract should be dismissed as a matter of law.

## CONCLUSION

For all the reasons set forth herein, Plaintiff has failed to establish that he is a whistleblower protected under Dodd Frank, that he was subjected to unlawful retaliation, or that

Defendants breached an express or implied contract.   Accordingly, his Complaint should be dismissed with prejudice in its entirety.

Dated: New York, New York        Respectfully submitted,
       April 18, 2014

                                 DAVIS & GILBERT LLP

                                 By:   ____/s/ Howard J. Rubin_____
                                 Howard J. Rubin (hrubin@dglaw.com)
                                 Jennifer Tafet Klausner (jklausner@dglaw.com)
                                 1740 Broadway
                                 New York, New York 10019

                                 *Attorneys for Defendants*